66 P.3d 1057 (2003)
149 Wash.2d 237
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Robert KUVARA, Attorney at Law.
No. 03603-9.
Supreme Court of Washington, En Banc.
Argued January 16, 2003.
Decided April 24, 2003.
*1058 Leland Ripley, Lake Stevens, for Petitioner.
Anne Seidel, Joanne Abelson, Seattle, for Respondent.
BRIDGE, J.
On May 9, 2000, the Washington State Bar Association (WSBA) filed a complaint against Robert Kuvara, alleging that he committed numerous ethical and criminal violations by listing the name of a man he knew to be dead as the grantor on a deed, allowing the man's widow to sign the man's name to the deed, notarizing the signature as though it were the dead man's, and submitting the false deed to be recorded. The WSBA's complaint also alleged that this conduct demonstrates that Kuvara is unfit to practice law.[1] The hearing officer found that Kuvara should be disbarred and the Disciplinary Board (Board) affirmed that decision by an 11-1 vote. We agree.

I
Kuvara was admitted to the WSBA in 1963 and has practiced in Washington for the past 39 years. His practice includes criminal defense, personal injury, and wills.
In 1982, a police officer named Samuel Hicks was shot and killed in the line of duty. Kuvara agreed to handle the probate of his estate pro bono for his widow, Terri Hicks.
*1059 Included in the estate was a piece of property in Shasta County, California. Although Kuvara contacted two California law firms for assistance in transferring the property to Terri Hicks, the transfer was never accomplished.
Despite the lack of a formal transfer, Terri Hicks sold the property to Samuel Hicks' sister, Nancy Maurice, for $5,000 in 1990. Hicks and Maurice continued to seek written documentation of the transfer from Kuvara for the next eight years. Eventually, Maurice decided to sell the property and received an offer to purchase from a third party on January 28, 1999. To assist with the sale, Maurice sought the assistance of Denise Butcher, an escrow agent. Although Butcher contacted Kuvara's office several times, she was not able to obtain a deed for the property or speak with Kuvara.
Meanwhile, Terri Hicks went to Kuvara's office on January 10, 1998, believing she was to sign the papers necessary to formally transfer the property to Maurice. When she arrived, a quitclaim deed was already prepared. The deed indicated that the grantor was Samuel A. Hicks. Terri Hicks signed her deceased husband's name on the deed. She maintained in her deposition that she would not have signed his name on her own accord. She also stated that she asked Kuvara if she should initial the signature and he indicated that she should not. Kuvara testified that he had no memory of the events that took place on the day that Terri Hicks went to his office, but that he had no reason to doubt the veracity of the statements made by Ms. Hicks.
Kuvara, a licensed notary public, then notarized the signature as that of Samuel A. Hicks by stamping the deed with his official notary seal and signing as notary. Before the hearing officer, Kuvara testified that he could not recall notarizing the document, but contended that if he had, he must have done so by mistake. The deed remained at Kuvara's office after Terri Hicks left.
In March 1999, 15 months after Terri Hicks signed the deed with her dead husband's name, it was filed with the recorder's office in Shasta County, California. Kuvara testified that he had no memory of sending the deed to California for filing, but that in such circumstances he would usually be the one to handle the filing of such documents.
When Denise Butcher obtained a copy of the deed from the public record, she determined that it had been forged because she knew from Maurice that Samuel Hicks had died approximately 16 years before the deed was signed. Maurice and Terri Hicks contacted Kuvara repeatedly about the false signature, but Kuvara failed to provide assistance until Maurice filed a grievance with the WSBA. Maurice and her husband hired a probate paralegal in California to resolve the matter, but the escrow did not close until November 1999, which resulted in a nine-month delay in the sale of the property.
Kuvara has been disciplined several times previously. In 1982, he received a censure for twice suggesting to a client that she backdate a real estate deed in order to divest herself of ownership of the property so that she could qualify for welfare benefits. In 1996, Kuvara stipulated to a reprimand for attempting to collect legal fees that had been discharged in bankruptcy, negotiating with the clients to obtain a reaffirmation of their debt while he was representing them in the bankruptcy proceeding, and failing to advise the court of the requirement that a reaffirmation must be in writing. Finally, Kuvara was suspended from the practice of law for 30 days in 1996 for various trust account violations, including commingling his funds with client funds and using client funds to pay his personal expenses.
In May 1999, Nancy Maurice and her husband filed a grievance against Kuvara with the WSBA. They later dismissed the grievance at Kuvara's request after he paid the fees of their California paralegal, but the WSBA decided to proceed with its investigation.
A hearing was held on February 22, 2001. The hearing officer, Marc L. Silverman, found that Kuvara engaged in criminal as well as unethical conduct. Specifically, the hearing officer found that Kuvara acted criminally by (1) advising Terri Hicks to commit forgery in violation of RCW 9A.60.020, (2) performing a false certification in violation of *1060 RCW 9A.60.050, (3) committing official misconduct by a notary in violation of RCW 42.44.160, and (4) making a false statement to a public servant in violation of RCW 9A.76.175.
Based on the same conduct, the hearing officer found several ethical violations. He found that Kuvara violated RPC 8.4(c) by engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation" and RPC 8.4(b) by committing "a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." RPC 8.4(c), (b). The hearing officer also found that Kuvara engaged in "conduct that is prejudicial to the administration of justice" under RPC 8.4(d) because he hindered Terri Hicks' and Maurice's attempts to lawfully convey the property. RPC 8.4(d). Finally, the hearing officer stated that Kuvara violated RPC 4.1(a) because he knowingly made a false statement of a material fact to a third person in the course of representing a client by submitting a falsely executed real estate deed to the recording office in California.
The hearing officer concluded that Kuvara should be disbarred. He found that Kuvara acted knowingly and intentionally, despite Kuvara's inability to recall the events and his contention at the hearing that it was merely a mistake on his part. He found it "inconceivable" that Kuvara's actions could be a simple mistake, instead concluding that Kuvara attempted to submit a false document as a "`short cut'" because he had "`dropped the ball'" in handling the probate 16 years previously.[2] He opined: "Too many steps were involved, too much care had to be taken, and too much formal legal work had to be accomplished for his `careless signature' on this quitclaim deed to constitute a `mistake.' "[3]
The hearing officer found several mitigating factors. He found that Kuvara had a good reputation in the community and was not motivated by greed or monetary gain. Although Kuvara's offer to pay for the paralegal fees would normally be a mitigating factor, the hearing officer found that it was neutralized by the fact that it was made only after the Maurices filed their grievance with the WSBA.
The hearing officer also found various aggravating factors. He emphasized the significance of Kuvara's previous disciplinary matters, particularly the advice to backdate a deed in 1982. He also found that Kuvara's 39 years of practice and the fact that he has handled numerous probate matters indicated that he knew the impropriety and seriousness of his actions. In addition, he stated that the 15-month delay between the execution of the forged deed and its recordation in California was an aggravating factor because of the additional distress that it caused Terri Hicks and Maurice, and because Kuvara had time to reconsider his actions, but submitted the false document for recordation anyway. He also found that Kuvara refused to acknowledge that his conduct was wrongful or to accept responsibility for his actions.
Kuvara appealed the hearing officer's disbarment recommendation to the Board and oral argument was set for September 7, 2001. Meanwhile, on September 4, 2001, Kuvara allegedly disclosed to his attorney for the first time that he suffered from diabetes and alcoholism. His attorney filed a motion with the Board under Rules for Lawyer Discipline (RLD) 6.5(a) for an order remanding the proceedings to the hearing officer for consideration of these illnesses as potential mitigating factors.[4] On July 2, 2002, the Board unanimously denied the motion to remand, finding that these conditions could not be considered newly discovered evidence. The Board also affirmed the hearing officer's findings of fact, conclusions of law and sanction recommendation by an 11-1 vote.[5] Kuvara *1061 appealed the Board's recommendation to this court.
On July 12, 2002, the WSBA filed a petition for the interim suspension of Kuvara with this court under former RLD 3.2(b).[6] Kuvara responded to the WSBA's interim suspension petition by requesting that it not be imposed until October 15, 2002, in order for him to conclude several pending client matters. This court heard oral argument regarding the interim suspension on September 5, 2002, and on the same day issued an order granting the interim suspension effective October 15, 2002.[7]

II
This court is the definitive authority for bar discipline cases in Washington. In re Disciplinary Proceedings Against Hankin, 116 Wash.2d 293, 295, 804 P.2d 30 (1991). However, we give considerable weight to the Board's recommendation. "As the only body to hear the full range of disciplinary matters, the Board has the opportunity to develop unique experience and perspective in the administration of sanctions. We should not lightly depart from recommendations shaped by this expertise and perspective." In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 94, 667 P.2d 608 (1983). In disciplinary cases, we accept as true any unchallenged factual findings made by the hearing officer and approved by the Board. In re Disciplinary Proceeding Against Carmick, 146 Wash.2d 582, 594, 48 P.3d 311 (2002). If challenged, the Board's findings of fact will not be overturned if supported by a clear preponderance of the evidence. Id. Although they are not conclusive, we give considerable weight to the hearing officer's findings, particularly when they involve the credibility and veracity of the witnesses. Id. at 593-94, 48 P.3d 311.

Kuvara's Motion to Remand
Kuvara argues that it was error for the Board to deny his motion to remand to the hearing officer for consideration of his alcoholism as a potential mitigating factor.[8] According to Kuvara, he revealed his alcoholism to his attorney three days prior to oral argument before the Board. A chemical dependency evaluation from an alcohol treatment facility indicated that he had taken his last drink on the same day as his disclosure to his attorney. Because his attorney was unaware of his alcoholism, Kuvara argues that it was newly discovered evidence and that the Board should have remanded for an additional hearing to address it as a possible mitigating factor. Kuvara claims the Board should not have attached any significance to the lack of evidence of personal problems in his testimony before the hearing officer because denial is a classic symptom of alcoholism.
The RLD provide that the respondent or disciplinary counsel may request an additional hearing if there is newly discovered evidence. RLD 6.5(a). The Board unanimously denied Kuvara's motion, finding that his alcoholism was not newly discovered evidence because he has been an alcoholic for the past 30 years. The Board also found that even if it were newly discovered, the evidence could not be considered a mitigating factor given the requirements of the American Bar Association's Standards for Imposing Lawyer Sanctions (1991 ed. & Supp.1992) (Standards).[9]
The WSBA argues that the evidence was not newly discovered because Kuvara was *1062 aware of his condition, even if his attorney was not. In Strong v. Sunset Copper Co., 9 Wash.2d 214, 227, 114 P.2d 526 (1941), this court found that evidence known by the client but not by his attorney could not be considered "newly discovered." Although Strong was not an attorney discipline case, Kuvara makes no argument as to why it would not apply in his case. Rather, Kuvara argues that he was in denial about his alcoholism, and consequently failed to inform his attorney about his condition earlier.
The WSBA also claims that even if it were newly discovered evidence, Kuvara's alcoholism would not be considered a mitigating factor under the Standards. The Standards include the following under mitigating factors:
[M]ental disability or chemical dependency including alcoholism or drug abuse when:
(1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
(2) the chemical dependency or mental disability caused the misconduct;
(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.
STANDARDS std. 9.32(i) (Supp.1992). Although the Board accepted the evidence that Kuvara was a late/middle stage alcoholic as indicated in his chemical dependency evaluation, it found that he failed to satisfy the other requirements of 9.32(i). First, Kuvara failed to demonstrate any connection between his misconduct and his illness. In fact, Kuvara's associate testified before the hearing officer that Kuvara was not impaired in any way and was as "[s]harp as a tack." Tr. of Proceedings at 65. Further, the Board found that Kuvara failed to show "a meaningful and sustained period of successful rehabilitation" as required by 9.32(i)(3) since he had stopped drinking only three days before appearing before the Board.
Arguing that it was error for the Board to deny his motion to remand, Kuvara cites Hankin. In Hankin, this court granted a motion for an order to gather additional evidence about alcoholism that Hankin had filed 26 days before his hearing. 116 Wash.2d at 301, 804 P.2d 30. Hankin, however, does not address the issue at bar here, which is whether the Board had the discretion to deny Kuvara's motion, not whether we would make the same decision in the first instance. Further, Hankin was decided in 1991, before the 1992 revision of the Standards. Under the Standards as they existed at the time of Hankin, the attorney merely needed to show the existence of a "physical or mental disability or impairment." STANDARDS std. 9.32(h) (1991). In 1992, the American Bar Association (ABA) revised its Standards by adding 9.32(i), which imposes more rigorous requirements for the use of alcoholism as a mitigating factor as discussed above. In contrast to Hankin, Kuvara must satisfy the more stringent requirements set forth in the current Standards, which he failed to do because he did not show a connection between his alcoholism and his actions or a sustained period of rehabilitation.
We find that the Board acted within its discretion when it denied Kuvara's motion to remand to the hearing officer. Despite the fact that his attorney may not have been aware of his illness, the evidence was not newly discovered since Kuvara has suffered from alcoholism for 30 years. Kuvara failed to establish any connection between his alcoholism and his misconduct or to demonstrate a meaningful period of recovery as required by the Standards.

Findings of Fact
Kuvara disputes the accuracy of two of the hearing officer's findings of fact. First, he argues that finding of fact 20 is incorrect because it states that Kuvara received a censure in 1982 for "back-dating a real estate deed." Decision Papers (DP) at 16.[10] Kuvara's censure was actually for advising a client to backdate a deed rather than for doing so himself.
*1063 The WSBA does not dispute that the record should reflect the correct reason for Kuvara's censure. Although agreeing that Kuvara is technically correct in noting that the hearing officer misstated his previous offense, the WSBA argues that what is significant about the 1982 censure is that it is a previous disciplinary sanction. It is clear from the hearing officer's findings that he was aware of the actual reason for Kuvara's censure, as he referred to "Kuvara's censure in 1982 for advising a client to back-date a deed" in his conclusions of law. DP at 23, CL 38; see also DP at 24, CL 40. Thus, it is evident that the wording of the finding was a drafting error by the hearing officer rather than an indication that he did not understand the true nature of Kuvara's prior misconduct. We hold that finding of fact 20 should be amended to reflect the correct reason for the discipline.
Second, Kuvara argues that no substantial evidence supports finding of fact 21. In this finding, the hearing officer stated: "In 1996 Kuvara stipulated to a reprimand for suing a former client over a fee owed to him. He obtained a judgment against the client and sought to garnish the client's pay despite the fact that he knew the client had discharged the fee obligation in bankruptcy." DP at 16, Finding of Fact 21. The reprimand issued to Kuvara indicates that although he knew that the client had discharged the debt in bankruptcy, Kuvara believed that the client had effectively orally reaffirmed the debt. What Kuvara apparently did not realize was that 11 U.S.C. § 524(c)(3) requires that reaffirmations be filed with the court, therefore making oral reaffirmations ineffective. Thus, although Kuvara knew that the client had discharged the debt in bankruptcy, as indicated by the hearing officer, he also believed the client had effectively reaffirmed the debt.
Again, the WSBA does not object to an accurate description of the events that gave rise to Kuvara's 1996 reprimand. However, the WSBA argues that this is likewise an error that probably did not affect the hearing officer's decision. The critical fact is that Kuvara was disciplined before. Moreover, the hearing officer also omitted facts regarding Kuvara's 1996 reprimand that reflect negatively on Kuvara from finding of fact 21. For example, Kuvara's reprimand states that by obtaining an oral reaffirmation from his clients, he attempted to obtain a pecuniary interest adverse to his clients without a written disclosure, which amounts to a conflict of interest. The reprimand also indicates that Kuvara violated RPC 3.3(a)(3) by failing to advise the court of the requirement that reaffirmations be filed with the court. Thus, although the hearing officer may have made Kuvara's conduct seem worse than it actually was by failing to mention the reaffirmation, he also made his conduct seem better by omitting the other findings of wrongdoing mentioned in the reprimand.
We hold that finding of fact 21 should be amended to properly reflect the reasons for Kuvara's 1996 reprimand. However, this change to the description of Kuvara's misconduct does not alter the existence of the reprimand as an aggravating factor for the purpose of determining the appropriate sanction in the current action.

Recommended Sanction
The hearing officer recommended disbarment and the Board approved this sanction by an 11-1 vote. Kuvara does not dispute that he engaged in the conduct described in the WSBA's complaint, nor does he deny that his misconduct was egregious. Nevertheless, he argues that he should be suspended for three years rather than disbarred.[11]

The ABA Standards
In disciplinary cases, the appropriate disciplinary sanction is determined by referring to the Standards. In re Disciplinary Proceeding Against Halverson, 140 Wash.2d 475, 492, 998 P.2d 833 (2000); In re Disciplinary Proceeding Against Johnson, 114 Wash.2d 737, 745, 790 P.2d 1227 (1990). Using the framework provided by the Standards, the Board must first determine the *1064 presumptive sanction by considering the following questions: (1) What ethical duty did the lawyer violate? (2) What was the lawyer's mental state? (3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? Halverson, 140 Wash.2d at 492, 998 P.2d 833. See also STANDARDS std. 3.0(a)-(c). Second, the Board considers whether any aggravating and/or mitigating circumstances indicate that the presumptive sanction should be altered. Halverson, 140 Wash.2d at 493, 998 P.2d 833; see also STANDARDS std. 3.0(d).
Here, the hearing officer found that Kuvara engaged in not merely unethical but also criminal behavior, including forgery, a false act by a notary public, and a false certification. Regarding Kuvara's mental state, the hearing officer found that Kuvara knew what actions he was performing and that it could not have been a mistake as Kuvara contended at his hearing. The hearing officer stated: "Too many steps were involved, too much care had to be taken, and too much formal legal work had to be accomplished for his `careless signature' on this quitclaim deed to constitute a `mistake.'" DP at 21, CL 33. Finally, the hearing officer found Kuvara's actions potentially harmful, stating: "There is no question but that both the transfer to Nancy Maurice and the transfer to her buyer were prejudiced by Kuvara's official misconduct, both in his capacity as a lawyer and as a notary." DP at 19, CL 28.
The presumptive sanction under the Standards for serious criminal misconduct is disbarment.[12] The Board should deviate from the presumptive sanction only if the aggravating or mitigating factors are sufficiently compelling to justify a departure. See In re Disciplinary Proceeding Against Anschell, 141 Wash.2d 593, 615, 9 P.3d 193 (2000). Here, the hearing officer found, and a majority of the Board agreed, that there were no mitigating circumstances warranting a more lenient sanction than disbarment. The hearing officer found Kuvara's disciplinary history to be a critical aggravating factor, stating: "It is obvious from his disciplinary history that Mr. Kuvara does not feel constrained by the rule of law or by the restrictions and limitations on a lawyers' conduct, or, for that matter, on the conduct of a public official, a notary." DP at 27, CL 47.
Although Kuvara recognizes that the presumptive sanction is disbarment and that the aggravating and mitigating circumstances do not warrant a deviation from that sanction, he argues that he should instead receive a three-year suspension. First, he asserts that his disciplinary infractions do not constitute a "pattern of misconduct." A "pattern of misconduct" is one of the potential aggravating factors in the Standards. STANDARDS std. 9.22(c). Kuvara argues that over the course of his career, he has engaged as much in a pattern of no misconduct as he has in a pattern of misbehavior. There are two problems with his argument. First, it is irrelevant that Kuvara engaged in periods of good conduct as well as bad conduct. This court has stated that "[e]nding misconduct does not erase ... that misconduct which has already occurred." In re Disciplinary Proceedings Against Dann, 136 Wash.2d 67, 83-84, 960 P.2d 416 (1998). Likewise, engaging in appropriate conduct most of the time does not eradicate prior disciplinary infractions from an attorney's record. Second, although the hearing officer considered Kuvara's prior disciplinary infractions to be an aggravating factor under Standard 9.22(a), he made no mention of 9.22(c) or a "pattern of misconduct" in his discussion of the aggravating factors in Kuvara's case. Thus, even if Kuvara's assertion that his conduct does not amount to a "pattern of misconduct" is correct, there is no reason to alter the hearing officer's conclusion given that the hearing officer made no such finding.
*1065 Next, Kuvara argues that, as a matter of law, he did not make a material false statement to a public official. The hearing officer found that by falsely notarizing the deed, Kuvara made a material false statement to the Shasta County recorder in violation of RCW 9A.76.175. RCW 9A.76.175 defines material statement as "a written or oral statement reasonably likely to be relied upon by a public servant in the discharge of his or her official powers or duties." Kuvara argues that because the recordation of a deed is a ministerial act, the recorder could not rely on anything submitted by Kuvara. However, as the WSBA points out, this ignores the fact that in California a deed can only be recorded if there is an acknowledgement certified by a notary. Kirsch v. Barnes, 153 F.Supp. 260, 263 (N.D.Cal.1957) (citing Cal. Gov't Code § 27286).[13] Therefore, without Kuvara's notarization, the deed was not entitled to be recorded. Even though the recorder may have no duty to inquire about the validity of the contents, the recorder nonetheless relies on the validity of the notarization. Thus, Kuvara's false notarization amounts to a material false statement because the deed could not have been recorded without it.
Kuvara also argues that the hearing officer and the Board incorrectly concluded that Kuvara's actions involved potential fraud on a subsequent purchaser. He asserts that because recording a deed in California does not change title and because a good faith purchaser would take clear title, there would be no harm to future purchasers. On the other hand, the WSBA argues that even if a subsequent purchaser would ultimately have clear title, he or she would still face the inconvenience and expense of having the title cleared. Future sales of the property could also be jeopardized by the lack of clear title, as potential buyers might withdraw their purchase offers once they discovered the title problem. Yet, although the hearing officer mentioned the potential harm to future purchasers at two points in his findings, he did not base any of the ethical or criminal violations on this factor. Thus, even if Kuvara is correct in stating that there would be little or no harm to potential purchasers, this has no effect on the hearing officer's sanction recommendation as he apparently did not rely on this factor in reaching his decision.
Finally, Kuvara contends that he did not engage in conduct prejudicial to the administration of justice under RPC 8.4(d). The hearing officer found a violation of RPC 8.4(d) because Kuvara's conduct interfered with Terri Hick's and Maurice's lawful efforts to accomplish the transfer of the property. In In re Disciplinary Proceeding Against Curran, 115 Wash.2d 747, 766, 801 P.2d 962 (1990), this court held that conduct prejudicial to the administration of justice under RPC 8.4(d) includes only violations of practice norms and the physical obstruction of justice. In Curran, the WSBA argued that an attorney convicted of vehicular manslaughter had violated RPC 8.4(d). Id. at 764, 801 P.2d 962. Disagreeing with the WSBA, the Curran court cited three cases containing examples of RPC 8.4(d) violations: conversion of trust fund money for personal use, taking photos of undercover officers to show to a friend with a cocaine problem, and breaking into a psychiatrist's office to steal documents. Id. at 764-65, 801 P.2d 962. Because his conduct does not match any of the specific examples mentioned by the Curran court, Kuvara argues that he did not engage in conduct prejudicial to the administration of justice.
Despite the specific examples noted, however, the Curran court defined the phrase broadly, stating: "[C]onduct deemed prejudicial to the administration of justice has generally been conduct of an attorney in his official or advocatory role or conduct which might physically interfere with enforcing the law." Id. at 764, 801 P.2d 962 (emphasis added). Kuvara does not deny that he was acting in his official role as an attorney and a notary when he committed forgery, performed a false certification, engaged in official misconduct by a notary, and made a *1066 false statement to a public servant. In contrast, Curran's conduct involved driving a motor vehicle rather than his official role as an attorney. Thus, although Kuvara's actions are not the same as those cited as examples by the Curran court, he nonetheless was clearly acting in his official capacity when he committed the misconduct, thus violating RPC 8.4(d).
In sum, we find Kuvara's contentions without merit. Given the misconduct at issue, Kuvara's mental state, the potential for injury, and the applicable aggravating and mitigating circumstances, disbarment is the appropriate sanction under the Standards.

The Noble Factors
Kuvara nevertheless argues that the presumptive sanction should not apply in his case under the Noble analysis. In 1983, in an attempt to provide an objective standard in bar disciplinary matters, this court adopted five factors to consider when determining the appropriate sanction for lawyer misconduct. Noble, 100 Wash.2d at 95-96, 667 P.2d 608. The five factors are (1) the purposes of attorney discipline, (2) proportionality of the sanction to the misconduct, (3) the effect of the sanction on the attorney, (4) whether the Board's recommendation is supported by the record, and (5) the extent of agreement among the members of the Board. Id. The Board's disciplinary recommendation is to be adopted unless one or more of these factors persuades the court otherwise. The rationale for adopting the Noble factors was a concern that inconsistent sanctions were being imposed, as the court stated that "[n]o clear formula has emerged for determining what period of suspension is appropriate in a particular case." Id. at 93-34, 667 P.2d 608.
When Noble was decided, the Standards had not yet been enacted. In 1986, the ABA implemented the Standards, which were designed to increase uniformity in imposing sanctions. "Inconsistent sanctions, either within a jurisdiction or among jurisdictions, cast doubt on the efficiency and the basic fairness of all disciplinary systems." STANDARDS at 1. In Johnson, this court formally adopted the Standards to govern lawyer disciplinary proceedings in Washington. 114 Wash.2d at 745, 790 P.2d 1227. Despite its adoption of the Standards, we have continued to apply the Noble factors as well, although not in all cases. Compare In re Disciplinary Proceedings Against Huddleston, 137 Wash.2d 560, 974 P.2d 325 (1999) (applying only the Standards), with Hankin, 116 Wash.2d at 310, 804 P.2d 30 (applying both the Standards and the Noble factors).
In several cases, this court has admitted that applying the Noble factors in addition to the Standards can be somewhat redundant, but has applied both nonetheless. In re Disciplinary Proceeding Against Tasker, 141 Wash.2d 557, 570, 9 P.3d 822 (2000); In re Disciplinary Proceeding Against Boelter, 139 Wash.2d 81, 103, 985 P.2d 328 (1999). In now examining the five factors, we find that three of the five are superfluous, given the framework set forth in the Standards and the Rules for Enforcement of Lawyer Conduct (ELC).
The first consideration under Noble is the purpose of attorney discipline. 100 Wash.2d at 95, 667 P.2d 608. Discussing this factor, the Noble court stated: "[O]ur primary concern is with protecting the public and deterring other lawyers from similar misconduct." Id. The first prong of this factor is identical to Standard 1.1, which states: "The purpose of lawyer discipline proceedings is to protect the public...." STANDARDS std. 1.1. The commentary to Standard 1.1 provides that another purpose of lawyer sanctions is to deter unethical conduct by other members of the profession. Id. Thus, we find this factor to be unnecessary, given that the Standards address the same concerns.
The second Noble factor is whether the sanction recommended by the Board is proportionate to the misconduct. 100 Wash.2d at 95, 667 P.2d 608. To assess the proportionality of a sanction, the Noble court directed that courts should undertake a comparison of the recommended sanction with the sanctions imposed in similar cases. Id. Proportionality is inherent, as this court evaluates attorney discipline cases in light of prior disciplinary cases. Nonetheless, given that the Standards do not specifically direct *1067 courts to consider this factor and because it is an important one to achieve not only consistency but fundamental fairness, we choose to retain it.
Third, Noble directs that the effect of the sanction on the attorney shall be taken into account. Id. "In some cases, it might be concluded that the recommended sanction is clearly excessive, weighing the nature of the misconduct against the hardships imposed on the attorney." Id. at 96, 667 P.2d 608. However, the Standards now set forth a framework for determining the appropriate sanction for each disciplinary infraction. Standard 1.3 states:
The Standards constitute a model, setting forth a comprehensive system for determining sanctions, permitting flexibility and creativity in assigning sanctions in particular cases of lawyer misconduct. They are designed to promote: (1) consideration of all factors relevant to imposing the appropriate level of sanction in an individual case; (2) consideration of the appropriate weight of such factors in light of the stated goals of lawyer discipline; (3) consistency in the imposition of disciplinary sanctions for the same or similar offenses within and among jurisdictions.
By following the framework laid out by the Standards, this court will ensure that the sanction imposed on an attorney is not clearly excessive. Thus, this factor is superfluous and shall be discarded.
The fourth Noble factor provides that in order for the Board's recommendation to be upheld, it must be supported by the record. 100 Wash.2d at 96, 667 P.2d 608. The Standards do not directly address this factor. However, the ELC provide that the Board's review is to be based on the record. ELC 11.12(a). Furthermore, the ELC's standard of review provides that the Board must review the hearing officer's findings of fact for substantial evidence. ELC 11.12(b). The ELC also provide that the record shall be transmitted to the Supreme Court for consideration upon notice of appeal. ELC 12.5. Thus, it is inherent in the review process under the ELC that the record shall be considered and this factor is therefore redundant.
Finally, the fifth factor to be considered under Noble is the extent of agreement among members of the Board. 100 Wash.2d at 96, 667 P.2d 608. The Noble court stated: "We will hesitate to reject a unanimous recommendation in the absence of clear reasons for doing so." Id. The degree of unanimity is not discussed in the Standards and we therefore continue to take this factor into consideration in assessing the appropriateness of a proposed sanction.
In sum, we retain the Noble factors of proportionality and degree of unanimity, but discard the remaining three as redundant due to the existence of similar provisions in the Standards and the ELC.

Application of Noble Factors to Kuvara's Case
Kuvara concedes that the presumptive sanction under the Standards is disbarment. He also admits that the applicable aggravating and mitigating circumstances do not warrant a deviation from the presumptive standard. He nevertheless argues that we should deviate from the recommendation of the hearing officer and the Board based on an analysis of the Noble factors. Because we have decided to retain only proportionality and degree of unanimity as factors to be considered, we will expressly consider only these two factors here.[14]
Kuvara makes no argument that the Board's lack of complete unanimity supports his argument for a three-year suspension rather than disbarment. However, he does argue that disbarment is a disproportionate sanction when compared to sanctions imposed on other lawyers for similar conduct. He cites In re Disbarment of Hopkins, 54 Wash. 569, 103 P. 805 (1909), stating that it suggests suspension is the appropriate sanction in Kuvara's case. Hopkins was disbarred for repeatedly notarizing false signatures. Id. at 570, 103 P. 805. Kuvara argues *1068 that because his conduct involves only a single incident, his sanction should not be as harsh as that imposed on Hopkins. This contention is without merit. First, as Kuvara acknowledges, Hopkins was decided over 90 years ago, before the adoption of the Standards. The Standards do not limit disbarment to situations in which an attorney has engaged in multiple instances of misconduct. Second, there is no indication that Hopkins had been disciplined previously for attorney misconduct, whereas Kuvara has been disciplined three times before.
Kuvara also argues that because he did not engage in misconduct for selfish reasons, disbarment is a disproportionately harsh sanction. He cites a law review article that discusses the relationship between the motive and the sanction imposed:
Generally, a correlation is made between the motive and the sanction imposed. Attorneys committing notarial misconduct for selfish reasons receive more severe sanctions, such as lengthy suspensions or disbarment. Attorneys committing misconduct based on obtaining a just result for the client or expediting the client's claim usually receive a lesser suspension or a reprimand.
Christopher B. Young, Comment, Signed, Sealed, Delivered ... Disbarred? Notarial Misconduct by Attorneys, 31 JOHN MARSHALL L.REV. 1085, 1094-95 (1998). Thus, Kuvara distinguishes his conduct from that of the Oregon attorney in In re Morin, 319 Or. 547, 878 P.2d 393 (1994), who was disbarred for improperly notarizing several hundred wills for his own gain. Although Kuvara may not have gained financially by his misconduct, this argument ignores the fact that the hearing officer found that "Kuvara had plenty of self interest, principally `saving face,'" to motivate him. DP at 26, CL 44. Furthermore, in Kuvara's case, the hearing officer found his history of prior discipline to be an aggravating factor, whereas Morin had no record of prior misconduct. See Morin, 878 P.2d at 402.
Kuvara's proportionality argument likewise ignores the fact that three previous sanctions have failed to deter misconduct on his part. Although Kuvara's actions in this case might not in and of themselves warrant disbarment, we find that disbarment is appropriate considering the aggregate effect of his prior misconduct. Although Kuvara attempts to minimize his prior disciplinary sanctions by noting that the first of them occurred 20 years ago, disbarment is consistent with other disciplinary cases in which there was history of misconduct. See In re Disciplinary Proceeding Against McGough, 115 Wash.2d 1, 13-14, 793 P.2d 430 (1990); In re Disciplinary Proceedings Against Yates, 110 Wash.2d 444, 755 P.2d 770 (1988). In Yates, the attorney was charged with failing to care properly for the property of an incompetent person that was entrusted to him. Yates had previously received reprimands, censures, suspensions and two stipulations for various other actions. 110 Wash.2d at 447-48, 755 P.2d 770. This court stated:
Taken singly, none of the actions for which Yates has been disciplined might justify disbarment. Taken together, and considering both their frequency and their underlying similarity (neglect of clients' business) and our responsibility to protect the public, we believe the appropriate measure of discipline to be disbarment.
Id. at 453, 755 P.2d 770. Like Yates, Kuvara has a history of misconduct. As the hearing officer found, lesser sanctions have had no effect. To protect the public and deter this pattern of behaviorboth by Kuvara and by other attorneysdisbarment is the proportionate sanction in this case.

III
Robert Kuvara has a history of disciplinary problems that began 20 years ago. He has been reprimanded, censured, and suspended from the practice of law. A hearing officer has now found that he has engaged in criminal and unethical conduct both as a lawyer and a notary. Although disbarment is a harsh punishment, it is appropriate in cases such as this in which lesser sanctions have not deterred misconduct. To protect the public and deter such misconduct by Kuvara and by fellow members of the bar, we order Kuvara's disbarment.
*1069 JOHNSON, MADSEN, IRELAND, CHAMBERS, OWENS, and FAIRHURST, JJ., and QUINN-BRINTNALL, J.P.T., concur.
NOTES
[1] In addition, the WSBA originally alleged that Kuvara failed to cooperate with the WSBA's investigation, but subsequently withdrew this allegation. Decision Papers (DP) at 16, Conclusion of Law (CL) 23.
[2] DP at 20-21, CL 31, 32.
[3] DP at 21, CL 33.
[4] As of October 1, 2002, the RLD have been supplanted by the Rules for Enforcement of Lawyer Conduct (ELC). However, at the time of the Board's decision, the RLD were still in effect. RLD 6.5(a) is now found at ELC 11.11, with no substantive modification.
[5] The one dissenting Board member would have recommended a two-year suspension rather than disbarment. DP at 4 n. 1.
[6] RLD 3.2(b) provided that when the Board recommends a lawyer's disbarment, disciplinary counsel shall petition for the lawyer's interim suspension for the duration of the proceedings. This provision is now found at ELC 7.2(a)(2).
[7] This court's interim suspension order specified that effective immediately, Kuvara was not to take on any new cases or clients and his work as an attorney was to be limited to concluding existing client matters. On December 10, 2002, the WSBA filed a petition for order to show cause with this court, alleging that Kuvara was in contempt of court because he filed notices of appearance for two new clients after September 5, 2002. This court has referred this matter to the King County Prosecuting Attorney's Office.
[8] Although Kuvara's motion also requested remand based on his diabetes, Kuvara's brief to this court did not argue that it was error to deny the motion on that ground.
[9] As discussed below, the Standards govern the imposition of sanctions in attorney discipline cases in Washington. See infra p. 1063-1064.
[10] The hearing officer made the same statement in his conclusions of law. DP at 26, CL 45.
[11] The newly effective ELC provide that a lawyer may be suspended for a period not exceeding three years. ELC 13.3(a).
[12] The Standards provide that disbarment is appropriate when:

(a) a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft...; or
(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.
Standards std. 5.11.
[13] Since the decision in Kirsch, this statute has been recodified at Cal. Gov.Code § 27287 (West 1988), which states: "[B]efore an instrument can be recorded its execution shall be acknowledged by the person executing it...." Acknowledgment of an instrument can be made before a notary public. Cal. Civ.Code § 1181 (West Supp.2003).
[14] Consideration of the other three Noble factors would not help Kuvara's argument, given that they are redundant under the Standards and he has failed to make a persuasive argument under the Standards.